## Cosgrove *v.* Woodward, Appellant.

*Contract—Contract by cablegrams—Affidavit of defense—Sale—Offer and acceptance.*

1. When one offers to sell a quantity of merchandise and deliver the same at a stipulated place, and for a named price, and the other party accepts the offer, the contract is then, without more, complete. There is no necessity for any further action on the part of the offerer.

2. The act of acceptance which completes a contract takes place when the answer containing the assent is sent, properly addressed, whether by messenger or mail, or telegram. It does not depend upon delivery of the answer to the one who made the offer, and it completes the contract even though the delivery never takes place.

3. A person who has accepted an offer cannot avoid the contract on the ground of mistake, where it appears that it was his own mistake due to his negligence in not reading and understanding a cablegram which contained the offer.

4. An alleged custom that a cable contract is not considered by the parties as completed until a credit is cabled to a reliable banking house to take up the bill of lading, is not a condition precedent to the making of the contract between merchants of a foreign country and commission merchants of this country.

5. Negotiations were conducted by cable between plaintiffs, produce dealers in Ireland, and defendants, commission merchants in Philadelphia, for the shipment of 3,000 bags of potatoes by plaintiffs to defendants in the steamship "Friesland" which was to sale from Liverpool about two weeks earlier than the "Haverford" which was to sail from the same port. The defendants were anxious to have

shipment by the "Friesland." On April 15 plaintiffs cabled "Friesland is fully booked." "Shall I ship 'Haverford.'" On the same day defendants cabled "Telegram came to hand too late. Business canceled unless you will accept order same as others 72 shillings per ton. Telegraph if you accept." Later in the same day plaintiffs cabled "If you will not accept 75 shillings telegraph, I can place elsewhere." On April 16 defendants cabled "Will not accept, unless at our price. Do just as you please." Then followed a series of cables all dated April 17 which in their order were as follows: From plaintiff: "Rather than lose the business I will accept your offer. Shipment Haverford. Confirm." From defendants: "We confirm the purchase." From defendants: "Please cancel our previous telegram and substitute the following. We confirm the purchase Friesland. We cannot accept Haverford." From plaintiffs: "Telegram came too late. Have secured freight room for 3,000. Haverford. Cannot secure freight upon Friesland. All taken up." *Held*, (1) that the contract of April 17 in the words "We confirm the purchase," completed the contract, and was not affected by the later cablegrams; (2) that the words of the cablegram were not ambiguous; (3) that the word "Haverford" was not a catchword intended to deceive the defendants; (4) that there was nothing to put the defendants off their guard; (5) that the fact that the defendants did not cable a credit is immaterial, inasmuch as the plaintiffs could waive the custom as to cabling a credit; (6) that the plaintiffs were entitled to a judgment for the amount of the purchase money.

Argued Oct. 17, 1911. Appeal, No. 273, Oct. T., 1910, by defendants, from order of C. P. No. 5, Phila. Co., Dec. Term, 1909, No. 4,680, making absolute rule for judgment for want of a sufficient affidavit of defense in case of Hugh Cosgrove and John J. Cosgrove, Copartners, trading as Hugh Cosgrove, v. E. Stockton Woodward and Edward Edmunds, Copartners, trading as E. S. Woodward & Company. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Affirmed.

Assumpsit for goods sold and delivered.

Rule for judgment for want of a sufficient affidavit of defense.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was order making absolute rule for judgment for want of a sufficient affidavit of defense.

*Ira J. Williams,* of *Simpson, Brown & Williams,* for appellants.—It is clearly settled in Pennsylvania that the acceptance of an offer must be unconditional and identical with the terms of the offer in order to constitute a valid contract: Joseph v. Richardson, 2 Pa. Superior Ct. 208; Clements v. Bolster, 6 Pa. Superior Ct. 411; Swing v. Walker, 27 Pa. Superior Ct. 366.

A jury should be allowed to pass upon the effect of cablegram No. 10 and should determine the true meaning of the equivocal expressions used, in view of all the surrounding circumstances: Clements v. Bolster, 6 Pa. Superior Ct. 411; Brown v. Brooks, 25 Pa. 210; McDonough v. Jolly, 165 Pa. 542.

If appellants' mistake in taking appellees' cablegram (No. 10) to be an unqualified acceptance, was induced by appellees, or if appellees were aware of said mistake and caught up the bargain, there is no contract: Fidelity & Cas. Co. v. Teter, 136 Ind. 672 (36 N. E. Repr. 283); Croyle v. Moses, 90 Pa. 250; Aaron's Reefs v. Twiss, 65 L. J. P. C. 54; Dickson v. Lambert, 98 Ind. 487; Stewart v. Cattle Ranch Co., 128 U. S. 383 (9 Sup. Ct. Repr. 101); Hume v. U. S., 132 U. S. 406 (10 Sup. Ct. Repr. 134); Singer v. Grand Rapids Match Co., 117 Ga. 86 (43 S. E. Repr. 755); Harran v. Foley, 62 Wis. 584.

The pleadings show a custom between domestic and foreign commission merchants in cable transactions, to the effect that the contract is not considered by the parties as completed until a credit is cabled to a reliable banking house to take up the bill of lading, that this custom was well known to the appellees, and that no credit was cabled in this case because of the immediate cancellation of the cablegram which was mistakenly sent: Guillon v. Earnshaw, 169 Pa. 463; Somerset Door & Column Co. v. Weber, 43 Pa. Superior Ct. 290.

*H. Spalding,* of *Fell & Spalding,* for appellees.—The contract between the parties was complete the moment the defendants deposited with the cable company their

cablegram of April 17, 1909, stating, "we accept the purchase:" Clements v. Bolster, 6 Pa. Superior Ct. 411; Tayloe v. Fire Ins. Co., 50 U. S. 390; Minnesota Linseed Oil Co. v. Collier White Lead Co., 4 Dillon, 431.

The mistake in this case was unilateral and cannot avoid the contract: Johnston v. Patterson, 114 Pa. 398; Fidelity & Cas. Co. v. Teter, 136 Ind. 672 (36 N. E. Repr. 283).

The custom alleged by the appellants is directly contrary to the settled· principles of the law of contracts: Coxe v. Heisley, 19 Pa. 243; Harris v. Sharples, 202 Pa. 243; Goodwin v. Robarts, L. R. 10 Ex. 337.

OPINION BY MORRISON, J., March 1, 1912:

The appellants are commission merchants in Philadelphia and the appellees are produce dealers in Ireland. On April 10, 1909, negotiations were commenced between the parties to the suit by cable for the shipment of 3,000 bags of potatoes by appellees to appellants on the steamship "Friesland," which vessel was to sail from Liverpool about two weeks earlier than the "Haverford" which was to sail from the same port. A large number of cablegrams passed between the parties which are all set out in the statement of claim, and, in our opinion, the first one of importance, for our consideration in this opinion, is the appellees to the appellants of April 14, 1909, as follows: "Offer accepted. 3,000 'Friesland' 75 confirm." The meaning of this, as explained in the statement of claim, is that the appellees offered to sell to the appellants 3,000 bags of potatoes at seventy-five shillings per ton. This offer was never confirmed by appellants and did not ripen into a contract. On April 15, the appellees cabled to the appellants: "'Friesland' is fully booked. Shall I ship 'Haverford'?" The affidavit of defense denies that the latter cablegram was ever received, but the statement avers that it was sent and the affidavit does not deny the sending. Up to this point, however, there was no contract between the parties and the prior cablegrams are important only to show the subject-matter

with reference to which the parties were dealing. It is proper to state that the cablegrams, prior to April 17, 1909, show that the appellants desired to have the potatoes shipped on the "Friesland" because it would leave Liverpool about two weeks earlier than the "Haverford."

We think the contract was formed by the following cablegrams (From appellants to appellees, April 15, 1909): "Telegram came to hand too late. Business cancelled unless you will accept order same price as others 72 shillings per ton. Telegraph if you accept." (From appellees to appellants, April 15, 1909): "If you will not accept 75 shillings telegraph. I can place elsewhere." (From appellants to appellees, April 16, 1909): "Will not accept unless at our price. Do just as you please." (From appellees to appellants, April 17, 1909): "Rather than lose the business I will accept your offer. Shipment 'Haverford.' Confirm." (From appellants to appellees, April 17, 1909): "We confirm the purchase." This we consider a clear, definite purchase made by the appellants of 3,000 bags of potatoes for seventy-two shillings per ton. The appellees clearly agreed to that proposition, with the statement that the shipment would be made per the steamship "Haverford," with a request for confirmation and a clear and concise confirmation was cabled by the appellants on the same day, to wit: "We confirm the purchase." The affidavit of defense does not deny the breach of this contract by the appellants and it does not deny the loss to the appellees by reason of such breach, as set out in the statement of claim. In their affidavit of defense appellants squarely take the position that the contract set forth in the statement was never entered into as a matter of law. Therefore, we think this is the only question before the court. These cablegrams are clear and concise and the affidavit of defense does not sufficiently set up any fraud, artifice or trick, or any other ground sufficient to carry the case to a jury.

It is true that on April 17, 1909, about one hour after

appellants cabled "We confirm the purchase," that they sent the following cablegram to appellees: "Please cancel our previous telegram and substitute the following. We confirm the purchase 'Friesland.' We cannot accept 'Haverford.'" This was replied to on the same day: "Telegram came too late. Have secured freight room for 3,000 'Haverford.' Cannot secure freight upon 'Friesland.' All taken up." All of the negotiations in regard to this sale and purchase were by cable and we are unable to see that any of the cablegrams contain anything requiring them to be submitted to a jury. In our opinion, the contract was complete when the appellants deposited with the cable company their cablegram of April 17, 1909, stating, "We confirm the purchase."

The appellants could not abrogate this contract by the cablegram sent an hour later without the consent of the appellees. The learned counsel for appellants contend that in such cases, "the usual practice is an offer and acceptance and then a confirmation by the offerer." By this they advance, as a proposition of law, that a contract is not complete with the offer and acceptance but must be followed by a confirmation or some further action on the part of the offerer. We do not so understand the law and it does not seem necessary to cite authorities to sustain the proposition that when one offers to sell a quantity of merchandise and deliver the same at a stipulated place and for a named price, and the other party accepts the offer, the contract is then, without more, complete. Really the only difference between the parties in regard to this contract was the shipment by the "Haverford" instead of by the "Friesland." But the appellee's proposition to ship the potatoes for the price named to appellants was by the "Haverford." The cablegram was concise and plain and if appellants read it they must have known that the shipment was to be by the latter vessel when they sent their cablegram of April 17, "we confirm the purchase." The cablegram of April 17, must be construed as negativing all prior negotiations as to shipment on the

"Friesland" and offered shipment on the "Haverford." This changed the nature of the cablegram from that of an acceptance into that of a counter-offer. It was then the privilege of the appellants to accept or reject the offer so made, and they saw fit to accept it. We think the legal proposition we have been discussing, that the offer and acceptance constituted a contract, is in harmony with our decision in Clements v. Bolster, 6 Pa. Superior Ct. 411; Swing v. Walker, 27 Pa. Superior Ct. 366.

On the point that the contract was completed at the moment when the appellants delivered their cablegram, dated April 17, 1909, "we confirm the purchase," to the cable company we cite 7 Am. & Eng. Ency. of Law (2d ed.), 135, where it is said: "That is to say, the act of acceptance which completes the contract takes place when the answer containing the assent is sent, properly addressed, whether by messenger, or mail, or telegraphed. It does not depend upon delivery of the answer to the one who made the offer, and it completes the contract even though the delivery never takes place." In the same volume, on p. 134, it is said: "Where the parties are separated and the contract arises out of an accepted offer, it is often important to determine when the obligation commences. The rule is that the obligation becomes obligatory from the moment the minds of the parties meet, even though a knowledge of the concurrence has not been brought home to them, and though one of the parties may have died after the act of assent has taken place without learning of it."

In Page on Contracts, sec. 52, it is said: "Where the mail or telegraph is a proper means of communication the great weight of modern authority is that the acceptance is binding on both parties from the moment it is transmitted, if such transaction is effected in the proper way. So an insurance policy which is not to be in effect until 'delivery' takes effect when it is mailed to the insured postage prepaid. . . . If the party making the offer attempts to revoke the offer by sending a later letter or tele-

gram, such attempted revocation is of no effect. Thus an offer was made by telegraph subject to "prompt reply." It was accepted by telegraph twelve minutes after receipt, which telegram was not delivered for an hour. After the telegram of acceptance was sent and before it was delivered a telegram was sent revoking the offer. The contract was held to be binding. So on the same principle the party who has accepted cannot by a subsequent communication modify the terms of the agreement thus made."

In Tayloe v. Fire Insurance Co. of Baltimore, 50 U. S. 390, the plaintiff had been in negotiation with the defendant insurance company for a policy on some of his property. The company notified its agent that the risk would be accepted. The agent notified Tayloe of the company's approval of his application, and on December 21, 1844, Tayloe sent the agent a check for the premium. On December 22, 1844, the property so insured burned. This occurred before the letter containing the premium reached the insurance company's agent. Tayloe brought suit to recover the insurance; and the supreme court of the United States, in reversing judgment of the lower court in favor of the defendant, held that Tayloe could recover.

In Minnesota Linseed Oil Co. v. Collier White Lead Co., 4 Dillon, 431, the court said: "It is well settled by the authorities in this country and sustained by the later English decisions, that there is no difference in the rules governing the negotiation of contracts by correspondence through the post office and by telegraph, and a contract is concluded when an acceptance of a proposition is deposited in the telegraph office for transmission."

Under the above authorities, and others, we are without doubt that the appellant's cablegram of April 17, 1909, accepting the appellees' offer of the same day completed the contract. The appellees' offer to ship by the "Haverford" was plain on the face of the cablegram and we can discover no evidence of any fraud, trick or artifice used by the appellees to induce the appellants to accept their

proposition. Suppose the appellants thought that the goods were to be shipped by the "Friesland," that is of no consequence because they unqualifiedly accepted the offer to ship by the "Haverford." But the learned counsel for appellants contend that this case, under the averments in the affidavit of defense, should have gone to a jury and they have cited authorities stating that a jury is necessary where the words of a contract are ambiguous by reason of trade usage or technical, local, generic, indefinite or equivocal. The counsel contend that the words of the cablegrams are susceptible of two interpretations. An inspection of the cablegrams conclusively negatives this assumption. It is impossible to read these telegrams and believe that the appellants were or could have been deceived if they had read them. If there was any mistake on the part of the appellants in regard to the cablegram of April 17, that appellees accepted their offer and would ship by the "Haverford," it was the appellant's own mistake due to their negligence in not reading and understanding the cablegram. In the case of Addicks v. Hutton, 2 W. N. C. 30, Hutton, while very busy, signed a guaranty. The defendant argued upon a rule to open judgment that he was not liable because he had not read the guaranty. The court discharged the rule. In Johnston et al. v. Patterson, 114 Pa. 398, the Supreme Court, by Mr. Justice PAXSON, said: "If the sureties signed the contract in ignorance of its contents they cannot avoid it now in the absence of any fraud or deceit on the part of the plaintiff. If they did not read or have it read to them it was their own fault. They were not prevented from reading it by any trick or artifice of the plaintiff." To the same effect is Page on Contracts, sec. 76. See also Anson on Contracts, p. 170. There is a class of cases in which the courts have declined to enforce contracts based upon the mistake of one party thereto where one of the parties in making or accepting an offer has made a mistake by inadvertence and this mistake has been obviously apparent to the other party and has been seized upon by him to

close the contract. A case of this character, Webster v. Cecil, 30 Beav. 62, is discussed by Anson on Contracts, p. 176. But that case and similar ones are very different from the present one.

The learned counsel for appellants argue that the word "Haverford" was a catchword intended to deceive the appellants but there is not the slightest evidence of this and it is idle to contend that the appellees in Ireland could think or even imagine that the appellants would mistake their cablegram of April 17, and read the word "Haverford." "Friesland." The principal thing the parties were contracting about was the sale and shipment of 3,000 bags of potatoes, and while it is true that the appellants had requested that the shipment be on the "Friesland," yet we are wholly unable to see anything like fraud, trick or artifice in the cablegram "rather than lose the business I will accept your offer. Shipment 'Haverford.' Confirm."

Appellant's counsel cite Fidelity & Cas. Co. v. Teter, 136 Ind. 672, on the proposition that contracts in writing do not bind where the complaining party has been put off his guard by reason of fraud or concealment of the other party. They also cite Croyle v. Moses, 90 Pa. 250, and 9 Cyc. 412, citing Aaron's Reefs v. Twiss, 65 L. J. P. C. 54. But we do not think these cases sustain their position. The Indiana case related to insuring the plaintiff's decedent while riding in public conveyances. A recovery was denied for an accident happening outside of a public conveyance, although defendant's agent had said that the policy covered every part of the deceased's journey. As to the contract the court said: "Its language is clear, positive and within the comprehension of a man of ordinary diligence. With such contracts the parties are bound by their contents and are presumed to have acted with full knowledge of their proper construction."

Croyle v. Moses, 90 Pa. 250, was a case where there was a fraudulent representation as to the soundness of a horse. The vendor knew him to be unsound in a certain respect,

and by artifice concealed the defect, etc. Held, it was such a fraud on the vendee as would justify him in rescinding the contract.

In the Twiss case we understand there was a false representation inducing the subscription to the stock of a corporation. Several other cases are cited in the same connection but as we understand them they were based on obvious and apparent mistakes made by the offerer and the offeree snapped up the offer and alleged that a binding contract had been made. In our opinion none of these cases are in point as to the present one.

Lastly, in their argument, appellant's counsel contend that the question of a custom which would modify or set aside a contract between the parties should be submitted to a jury. The contention is that such a cable contract is not considered by the parties as completed until a credit is cabled to a reliable banking house to take up the bill of lading; that this custom was well known to the appellees, and that no credit was cabled in this case because of the immediate cancellation of the cablegram which was mistakenly sent. If there is such a custom as is alleged, it is not a condition precedent to the making of contracts between merchants of Ireland and commission merchants of this country. At most it was an advantage that accrued to the appellee. They might have demanded the cabling of a credit. It is well said by appellee's counsel: "It is difficult to see how the defendants can avail themselves of their own default in not cabling the credit. The custom was one under which the plaintiffs had a right to demand the advantage conferred by it or they might waive such an advantage. They elected not to demand the credit." We do not think the question of the custom is sufficient to carry the case to a jury. It surely did not injure the appellants that the appellees saw fit to waive the custom, if it existed.

Upon a careful consideration of the appellants' affidavits of defense, argument and authorities, we reach the conclusion that the learned court below did not err in

granting judgment against the appellants for the amount of the plaintiff's claim.

The assignments of error are all dismissed and the judgment is affirmed.